## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW M MEXICO

**MICHELLE ARMIJO,**

      **Plaintiff,**

    **vs.**                     **Civ. No. 12-455 ACT**

**MICHAEL J. ASTRUE, Commissioner,**
**Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Reverse or Remand for a Rehearing With Supporting Memorandum ("Motion") of the Plaintiff Michelle Armijo ("Plaintiff"), filed January 22, 2013 [Doc. 17].  The Commissioner of Social Security ("Defendant") filed a Response on April 1, 2013 [Doc. No. 18], and Plaintiff filed a Reply on April 9, 2013 [Doc. No. 19].  Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court finds that Plaintiff's Motion is well taken and will be **GRANTED**.

## I.  PROCEDURAL RECORD

On December 9, 2008, Plaintiff filed an application for Supplemental Security Income ("SSI") under Title  XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3) and an application for Social Security Disability Insurance Benefits ("DIB") under Title  II of the Social Security Act, 42 U.S.C. §§ 401.  [Tr. 133, 140.]  Plaintiff alleges a disability beginning September 30, 2008, due to diabetes, depression, and migraines. [Tr. 154.]  Plaintiff's application was initially

denied on January 28, 2009, and denied again at the reconsideration level on April 20, 2009.
[Tr. 75-78.]

The ALJ conducted a hearing on June 2, 2010. [Tr. 32-54.]  At the hearing, Plaintiff was represented by Attorney Michael Armstrong.  On November 15, 2010, the ALJ issued an unfavorable decision.  In his report, the ALJ found that since September 30, 2008, the Plaintiff had the following severe impairments: diabetes mellitus, neuropathy, hypertension, obesity, affective disorder, and headaches. [Tr. 20.]  However, the ALJ concluded that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Tr. 21.]  The ALJ also found that since September 30, 2008, Plaintiff had the residual functional capacity to perform light work that requires only simple tasks and simple instructions, and where Plaintiff is required to maintain concentration, pace, and persistence on tasks for only two hours at a time. [Tr. 22.] The ALJ concluded that Plaintiff is capable of performing her past relevant work as a fast food worker. [Tr. 24.]

On February 28, 2012, the Appeals Council issued its decision denying Plaintiff's request for review and upholding the final decision of the ALJ. [Tr. 1.] On April 30, 2012, the Plaintiff filed her Complaint for judicial review of the ALJ's decision. [Doc. 1.]

Plaintiff was born on August 27, 1979. [Tr. 133.]  The Plaintiff completed her GED in 2004[1] and has past work experience as a caregiver, fast food worker, clerical worker, and driver.

---

[1]  Plaintiff reported to Dr. Cathy L. Simutis that she completed the eleventh grade and had not passed the GED examination. [Tr. 226.] Plaintiff's Motion also indicates that Plaintiff left school after the eleventh grade and has not passed the GED examination. [Doc. 17 at 9.]

[Tr. 155.]  The Plaintiff has not engaged in any substantial gainful activity since her alleged onset date of September 30, 2008. [Tr. 154.]

## II.  STANDARD OF REVIEW

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).   Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[2]

---

[2]  Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(C).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its opinion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214 (quotation omitted).

### III.  MEDICAL HISTORY

Plaintiff's medical history is significant for diabetes mellitus type 2, neuropathy, hypertension, migraines, obesity and depression. [Tr. 204, 206, 226, 247, 253, 261, 278, 281, 285.] The Plaintiff reported to Social Security that she stopped working because her "disabling conditions became overwhelming. My doctor will not release me to work for the next year due to these conditions." [Tr. 155.]

#### A.    Roland K. Sanchez, M.D.

The Administrative Record contains records for ten visits at the office of Family Practitioner Dr. Roland K. Sanchez in Belen, New Mexico, from September 18, 2008, through June 7, 2010.[3] [Tr. 223, 248-50, 272-73, 276-80, 282, 284-85, 288.] On September 18, 2008,

---

[3]  The records contain signatures from various healthcare providers in Dr. Sanchez's practice and it is unclear which healthcare providers were providing care to the Plaintiff. Plaintiff was seen several times by Physician Assistant Larry Rustemeyer.

Plaintiff initially presented to Dr. Sanchez's practice complaining of a migraine. [Tr. 250.] She also reported that she was a "borderline diabetic" and "under a lot of stress." [Id.] Plaintiff was diagnosed with "migraines and anxiety," and prescribed Xanax.[4]

On November 10, 2008, Plaintiff returned to Dr. Sanchez's practice requesting sample medications for her migraines and "nerves," and wanted to have her blood sugar checked. [Tr. 248.] Plaintiff reported that she had recently been to the emergency room because of a migraine. [Id.] Plaintiff was diagnosed with migraines, Diabetes II uncontrolled, and depression. [Id.] She was given samples of Lexapro[5] and Janumet,[6] and prescribed Hydrocodone for pain.

On December 8, 2008, Plaintiff presented to Dr. Sanchez's practice for a follow up on her diabetes and medications, and also requested a letter supporting her disability claim. [Tr. 249.] Plaintiff was provided with a physician note that stated she was "totally disabled and will remain so for the next year due to her depression and diabetes." [Tr. 223.]

On April 30, 2009, Plaintiff was provided prescription refills for Lexapro and Januvia. [Tr. 280.]

On August 24, 2009, Plaintiff was seen for a follow up on her diabetes and migraines. [Tr. 285.] Plaintiff's prescription for Lexapro was refilled. [Id.]

---

[4] Alprazolam (Xanax) belongs to a group of drugs called benzodiazepines. Alprazolam is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. http://www.drugs.com/alprazolam.html

[5] Lexapro (escitalopram) is an antidepressant belonging to a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Lexapro is used to treat anxiety in adults. Lexapro is also used to treat major depressive disorder in adults and adolescents who are at least 12 years old. http://www.drugs.com/lexapro.html

[6] Janumet contains a combination of metformin and sitagliptin. Metformin and sitagliptin are oral diabetes medicines that help control blood sugar levels. http://www.drugs.com/janumet.html

On October 19, 2009, Plaintiff presented with flu-like symptoms and was requesting a refill on her prescriptions. [Tr. 279.] Plaintiff was given a flu shot, and the record on this date indicates that Plaintiff is now taking Metformin.[7]

On November 23, 2009, Plaintiff returned complaining of migraines. [Tr. 278.] The record does not indicate any change of medication or course of treatment. [Id.]

On February 19, 2010, Plaintiff saw Physician Assistant Larry Rustemeyer and was complaining of leg pain. [Tr. 277.] They discussed the possibility of neuropathy related to her diabetes. [Id.] PA Rustemeyer referred Plaintiff for physical therapy for generalized deconditioning, weight loss, and bilateral leg pain. [Id., Tr. 253.]

On May 6, 2010, PA Rustemeyer prepared a Medical Assessment of Ability To Do Work-Related Activities (Non-Physical) and a Medical Assessment of Ability To Do Work-Related Activities (Physical). [Tr. 272-73.]  PA Rustemeyer assessed that Plaintiff had marked limitations affecting the following non-physical work activities: (1) perform activities within a schedule; (2) maintain regular attendance and be punctual within customary tolerance; (3) maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; (4) sustain an ordinary routine without special supervision; (5) work in coordination with/or proximity to others without being distracted by them; (6) make simple work-related decisions; and (7) complete a normal workday and workweek without interruption from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods. [Tr. 272.]  PA Rustemeyer assessed Plaintiff's limitations affecting physical work activities as follows: (1) Plaintiff cannot maintain physical effort for

---

[7]  Metformin is an oral diabetes medicine that helps control blood sugar levels. http://www.drugs.com/metformin.html

long periods without a need to decrease activity or pace, or to rest intermittently because of pain

and fatigue; (2) Plaintiff can only occasionally lift less than 5 pounds; (3) Plaintiff can

stand/walk less than 2 hours in an 8-hour workday; (4) Plaintiff can sit for less than 4 hours in an

8-hour workday; (5) Plaintiff's ability to push/pull  is limited in her lower extremities; (6)

Plaintiff cannot do repetitive gross or fine manipulation; and (7) Plaintiff can never knee, stoop,

crouch or crawl. [Tr. 273.]

On June 7, 2010, PA Larry Rustemeyer provided a "To Whom It May Concern" letter

indicating that Plaintiff had started an insulin program. [Tr. 288.]

**B.**     **Case Analysis - Daivd P. Green, M.D.**

On January 12, 2009, state agency medical consultant Dr. David Green prepared a Case

Analysis based on his review of Plaintiff's medical records from Dr. Roland Sanchez. [Tr. 224.]

Dr. Green found "no evidence for end-organ damage from the diabetes mellitus and she has only

one emergency room visit and one outpatient visit for a migraine."  Dr. Green determined that

Plaintiff's physical condition was non-severe. [Tr. 337-344.]

**C.**     **Cathy L. Simutis, Ph.D.**

On January 13, 2009, Plaintiff was psychologically evaluated by Dr. Cathy L. Simutis.

[Tr. 226.]  Plaintiff reported a history of depression and migraines, and told Dr. Simutis that she

had been trying to get into counseling at Valencia Counseling but they were not accepting new

patients. [Id.]  Plaintiff stated that she has lost interest in activities she used to enjoy, feels

fatigued, and sometimes has feelings of worthlessness. [Id.] She showers everyday, but gets back

into her pajamas and stays in bed approximately four days out of a week. [Tr. 227.] Plaintiff

denied any significant weight change, psychomotor agitation, feelings of guilt, difficulty

thinking, difficulty concentrating, or trouble making decisions. [Tr. 226.] Dr. Simutis assessed

Plaintiff as follows:

> She came to the interview casually dressed wearing pajama bottoms.  She was alert
> and oriented times three.  She maintained good eye contact and appeared calm and
> cooperative.  Her rate and tone of speech were within normal limits.  There were no
> indications of psychotic thought processes.  She denied hallucinations, suicidal
> ideation and homicidal ideation.  She stated that she has not had any suicidal
> thoughts since she started her medications.  She does not have a history of violence.
> She describes her own mood as "not as outgoing and friendship as I was."  Her affect
> during the interview appeared congruent.  She denied any recent memory change.
> Her gross intelligence appears to be in the average range.  She was not able to
> correctly complete reverse serial sevens.  She was able to complete reverse serial
> threes correctly.  Her insight and judgment appear adequate.  She would be able to
> handle her own benefits.

[Tr. 227.] Dr. Simutis diagnosed Plaintiff with major depressive disorder, moderate, and a GAF

of 50.[8]  Dr. Simutis determined that Plaintiff had mild limitations in her ability to understand and

remember instructions, her ability to concentrate and persist in a task, and her ability to adapt to

change. [Id.]  Dr. Simutis determined that Plaintiff had moderate limitations in her ability to

interact with coworkers and the public. [Id.]

### D.   Psychiatric Review Technique - Dr. W. Miller Logan

On January 26, 2009, State agency medical consultant Dr. W. Miller Logan prepared a

Psychiatric Review Technique based on his review of Plaintiff's medical records and adult

functional report.  [Tr. 229-242.]  He assessed Plaintiff's medical disposition based on Listing

12.04 - Affective Disorders.  [Tr. 229.] Dr. Logan's notes state as follows:

> Medical evidence notes a diagnosis of major depressive disorder.  MSE 01/13/2009
> reveals claimant was casually dressed wearing pajama bottoms.  She was alert and

---

[8]   The GAF is a subjective determination based on a scale of 1-100 of "the clinician's judgment of the
individual's overall level of functioning."  Diagnostic & Statistical Manual of Mental Disorders, 5th ed. (1994)
("DSM-IV"), p. 32.  Individuals with a GAF between 41 and 50 having serious symptoms such as suicidal ideation,
severe obsessional rituals, or frequent shoplifting OR serious impairment in social, occupations, or school
functioning, such as no friends and unable to keep a job.

oriented. She maintained good eye contact and appeared calm and cooperative. Her rate and tone of speech were within normal limits. No indication of psychotic thought processes was noted. She denied hallucinations, suicidal ideation and homicidal ideation. Her affect was congruent. She denied any recent memory change. Her intelligence appeared to be in the average range. She was unable to correctly complete reverse serial 7s but was able to correctly complete reverse serial 3s. Her insight and judgment appeared adequate.

Claimant's ADLs include fixing meals, grocery shopping and doing laundry. She has no problems providing for her personal care. She drives and spends time with family and friends.

Considering the above findings, it is determined that claimant's impairment does not impose severe functional limitations: therefore, assessed as non-severe.

[Tr. 241.] Dr. Logan indicated that Plaintiff's functional limitation is mild with respect to activities of daily living, maintaining social functioning. and maintaining concentration, persistence, or pace. [Tr. 239.] Dr. Logan indicated that Plaintiff had had one or two episodes of decompensation. [Id.]

### E.    Case Analysis - Janice Kando, M.D.

On April 17, 2009, State agency medical consultant Dr. Janice Kando prepared a Case Analysis based on her review of Plaintiff's medical records from Dr. Roland Sanchez. [Tr. 224.] Dr. Kando stated as follows:

Claimant denied at initial as non-severe. At reconsideration, she indicates additional treatment from treating physician, however, when we ordered [medical evidence of record], it was returned with a note indicating there was no additional treatment. I called the office of the treating physician and was told that there were no additional notes. The medical evidence of record was again reviewed. The assessment on the 416 dated 1-12-2009 is affirmed as written.

[Tr. 243.]

### F.    Case Analysis - Charles F. Bridges, Ph.D.

On April 18, 2009, State agency medical consultant Dr. Charles F. Bridges prepared a Case Analysis based on his review of Plaintiff's medical records from Dr. Roland Sanchez and

psychological evaluation from Dr. Cathy Simutis. [Tr. 244.] Dr. Bridges determined that
"[b]ased on the lack of additional information, the prior [Psychiatric Review Technique] is
affirmed as written." [Tr. 244.]

###　　　G.　　　Paradigm Physical Therapy and Wellness - Melissa Neal, P.T.

On March 3, 2010, Plaintiff was referred by PA Larry Rustemeyer to Paradigm Physical
Therapy and Wellness for "generalized deconditioning, weight loss, and bilateral leg pain".
[Tr. 253.] Physical Therapist Melissa Neal identified the following problems: (1) decreased
lower quarter strength; (2) decreased core strength; (3) decreased ROM; (4) difficulty
negotiating stairs; (5) difficulty performing ADL's; and (6) high risk for heart disease. [Tr. 254.]
PT Neal diagnosed Plaintiff with pain in joint, pelvic region and thigh; abnormality in gait; and
muscular wasting and disuse atrophy. [Tr. 253.]  PT Neal indicated that Plaintiff's rehab
potential was good. [Id.] She established a plan of care to see Plaintiff two to three times per
week for four to six weeks. [Id.] Plaintiff's treatment would consist of neuromuscular re-
education, strengthening exercises, functional mobility training, patient education, instruction in
home exercise program, training in proper posture and body mechanics, gait and balance
training, stretching, and active/passive range of motion. [Id.]

On March 4, 2010, Plaintiff attended physical therapy and was initiated on a re-education
program for diabetic neuropathy and heart disease risk factors. [Tr. 252.] Plaintiff also
participated in specific therapeutic activities and tolerated the program well. [Id.]

On March 9, 2010, Plaintiff cancelled her appointment due a family emergency.
[Tr. 255.]  Plaintiff was a no show for her next four scheduled appointments and her treatment
was terminated. [Id.]

H.    **Valencia Counseling Services**

On March 18, 2010, Plaintiff presented to Valencia Counseling Services and was

evaluated by Licensed Mental Health Counselor Paul Weeks. [Tr. 262.] LMHC Weeks prepared

a diagnostic review as follows:

> Client suffering from depression symptoms including hypersomnia, feelings of
> worthlessness, sadness, lethargy, client isolates, and feels her life is meaningless.
> Also she reports feeling anxious at times especially in the evenings; shortness of
> breath, rapid heartbeat, "feels like there is someone sitting on my chest."  Client says
> she has been feeling this way for past two years since her mother passed away.

[Tr. 262.] LMHC Weeks diagnosed Plaintiff with major depression disorder (single episode,

severe, without psychotic symptoms), anxiety disorder nos, and bereavement. [Id.] LMHC

Weeks assigned Plaintiff a GAF of 45.  [Id.]  LMHC Weeks recommended "ongoing weekly IT

(individual therapy), med management, possibly CCSS (Comprehensive Community Support

Services) and PSR (Psychosocial Rehabilitation Services)." [Tr. 263.]

On April 29, 2010, Plaintiff was discharged from Valencia Counseling Services for

noncompliance. [Tr. 264.]

I.    **Emily Moore, Ph.D.**

On January 23, 2011, Plaintiff was psychologically evaluated by Emily Moore, Ph.D. at

the request of Plaintiff's attorney, Michael Armstrong. [Tr. 290.] Plaintiff reported to Dr. Moore

that she has chronic pain due to neuropathy in her legs secondary to diabetes, and chronic

depression and migraines that impairs her ability to concentrate. [Id.] She told Dr. Moore that

she "doesn't want to get out of bed anymore, and that she has anxiety, panic attacks, and mood

swings."  Plaintiff stated that she had experienced suicidal ideation when she received a letter of

denial regarding her application for disability services. [Tr. 292.]  Dr. Moore reviewed the

psychological report from Dr. Simutis and the diagnostic impression prepared by LMHC Weeks.

11

[Id.]  Dr. Moore evaluated Plaintiff using clinical interview, mental status examination, Montreal

Cognitive Assessment, Burns Depression Checklist, Generalized Anxiety Disorder - 7

Questionnaire, the Mood Disorder Questionnaire, and Personality Assessment Inventory. [Id.]

Dr. Moore diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Major Depression, chronic, severe, with psychotic features |
| | Rule out Bipolar Disorder Type II |
| | Rule out Schizoaffective Disorder, Bipolar Type |
| Axis II: | Diagnosis Deferred |
| Axis III: | Diabetes |
| | Chronic pain due to diabetic neuropathy |
| | Migraine |
| | Asthma |
| Axis IV: | Occupational Stressors |
| Axis V: | GAF: 30[9] |

[Tr. 295.]

Dr. Moore prepared a Medical Assessment of Ability To Do Work-Related Activities

(Mental). [Tr. 296-97.] Dr. Moore assessed that Plaintiff had marked limitations affecting the

following mental/emotional capabilities: (1) remember locations and work-like procedures;

(2) understand and remember very short and simple instructions; (3) understand and remember

detailed instructions; (4) carry out very short and simple instructions; (5) carry out detailed

instructions; (6) maintain attention and concentration for extended periods of time; (7) perform

activities within a schedule, maintain regular attendance and be punctual within customary

---

[9]  Individuals with a GAF between 21 and 30 have behavior that is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends).

tolerance; (8) sustain an ordinary routine without special supervision; (9) work in coordination with/or proximity to others without being distracted by them; (10) make simple work-related decisions; (11) complete a normal workday and workweek without interruption from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (12) interact appropriately with the general public; (13) accept instructions and respond appropriately to criticism from supervisors; (14) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (15) respond appropriately to changes in the work place; (16) travel in unfamiliar places or use public transportation; and (17) set realistic goals or make plans independently of others. Dr. Moore assessed that Plaintiff had moderate limitations affecting the following mental/emotional capabilities: (1) ask simple questions or request assistance; (2) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (3) be aware of normal hazards and take adequate precautions.)

Dr. Moore evaluated Plaintiff under Listing 12.04 - Affective Disorders and found that Plaintiff met the "A, "B" and "C" criteria. [Tr. 298.]

## ANALYSIS

Plaintiff asks this Court to address three issues on review. First, that the ALJ's finding that Plaintiff has the ability to perform the mental and physical requirements of light work is contrary to the evidence and the law. Second, that the ALJ's conclusion that Plaintiff can return to her past work is also contrary to the evidence and the law. And third, that the ALJ's credibility determination is contrary to law.

**Step Four Findings**

Plaintiff first argues that the ALJ's finding that Plaintiff has a residual functional capacity to perform light work is unsupported by the evidence and contrary to law because the Plaintiff has exertional limitations that preclude light work and the ALJ ignored findings regarding Plaintiff's mental limitations. [Doc. 17 at 14, 17.] In support of her argument, Plaintiff states (1) the ALJ failed to explain why he rejected the assessment from PA Rustemeyer limiting Plaintiff's ability to lift to no more than five pounds, and limiting her ability to stand/walk for less than two hours a day; (2) the ALJ failed to discuss relevant findings from PT Neal indicating that Plaintiff had muscle wasting and atrophy; (3) the ALJ failed to assess the "physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)"; and (4) the ALJ failed to cite to any treating or examining source evidence to support a finding that Plaintiff can walk and stand for most of a work-day on a sustained basis. [Id. at 14-16.]  Plaintiff also states that the ALJ ignored findings related to Plaintiff's mental limitations, specifically that she has debilitating depression and anxiety and should avoid "dealing with people." [Doc. 17 at 17-18.]

In its Response, the Defendant contends that (1) the ALJ discussed and articulated sufficient reasons for discounting PA Rustemeyer's opinion, namely that the limitations he assessed were inconsistent with Plaintiff's activities of daily living and Plaintiff's own testimony that she can lift up to ten pounds; (2) the ALJ accurately cited PT Neal's treatment notes and determined there is nothing in her notes to preclude Plaintiff from performing light work; and (3) the ALJ considered the Plaintiff's activities of daily living, reviewed the record, and properly concluded that Plaintiff retained a physical RFC to perform light work.  [Doc. 18 at 5-7.] With

14

respect to Plaintiff's mental limitations, the Defendant argues that (1) the ALJ considered the entire record; (2) the ALJ fully incorporated Dr. Simutis's opinion, including that Plaintiff had moderate limitations in interacting with coworkers and the general public; and (3) the ALJ's mental RFC findings is supported by substantial evidence. [Doc. 18 at 8-10.]

In her Reply, Plaintiff reiterates that the ALJ failed to perform the appropriate analysis in assessing the weight he afforded to medical evidence and, more specifically, why he rejected the opinion of PA Rustemeyer. [Doc. 19 at 1-2.]  Plaintiff also states that the Defendant's incorporation of Dr. Simutis's opinion regarding Plaintiff's limitations in interacting with people is not addressed by the ALJ's limiting Plaintiff to job that require only simple tasks and instructions. [Doc. 19 at 4.]

In determining a claimant's physical abilities, the ALJ should "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. § 404.1545(b).  The ALJ is required to consider all of the claimant's impairments, including impairments that are not severe.  *See* 20 C.F.R. §§ 404.1545(d) , 416.945; *see also Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010).  "[T]he ALJ must make specific [RFC] findings." *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). And those findings "must be supported by substantial evidence." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). The RFC assessment must include a narrative discussion as follows:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual case perform based

on the evidence available in the case record. The adjudicator must also explain how
any material inconsistences or ambiguities in the evidence in the case record were
considered and resolved.

. . .

The RFC assessment must always consider and address medical source opinions. If
the RFC assessment conflicts with an opinion from a medical source, the adjudicator
must explain why the opinion was not adopted.

SSR 96-8p, 1996 WL 374184, at *7.

Here, the ALJ's analysis does not meet these standards. In making his RFC

determination here, the ALJ failed to describe how the evidence supports his conclusion that the

Plaintiff can perform light work, failed to explain why he rejected the assessment from PA

Rustemeyer, and failed to make specific findings supported by substantial evidence regarding

Plaintiff's severe impairments and her ability to perform sustained work activities.

## 1.     Plaintiff's Physical Ability To Do Light Work

The ALJ fails to point to what medical evidence he relied on in determining Plaintiff's

residual functional capacity to do light work. Light work is described as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds. Even though the weight lifted may
be very little, a job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some pushing and pulling
of arm or leg controls. To be considered capable of performing a full or wide range
of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). PA Rustemeyer assessed Plaintiff's limitations affecting physical

work activities as follows: (1) Plaintiff cannot maintain physical effort for long periods without a

need to decrease activity or pace, or to rest intermittently because of pain and fatigue;

(2) Plaintiff can only occasionally lift less than 5 pounds; (3) Plaintiff can stand/walk less than

2 hours in an 8-hour workday; (4) Plaintiff can sit for less than 4 hours in an 8-hour workday;

(5) Plaintiff's ability to push/pull  is limited in her lower extremities; (6) Plaintiff cannot do repetitive gross or fine manipulation; and (7) Plaintiff can never knee, stoop, crouch or crawl. [Tr. 273.] In addition to PA Rustemeyer's assessment, Plaintiff testified at the hearing that she could not lift anything more than 10 pounds without hurting herself. [Tr. 46.] She also testified that she can only stand or walk for about 15 minutes before she would have to sit down, and that when she is sitting down she has problems with swelling and pain due to her neuropathy. [Tr. 47.]

Despite the physical limitations assessed by PA Rustemeyer and the limitations described by Plaintiff's testimony, and without citing to any medical evidence in the record, the ALJ determined that the Plaintiff can perform light work which requires lifting up to 20 pounds, frequent lifting up to 10 pounds, requires a good deal of walking and standing, and some pushing and pulling of arm or leg controls .  While the ALJ points to Plaintiff's ability to drive, shop for groceries, and care for her medical needs, the ALJ fails to add that Plaintiff only drives short distances, will take someone with her grocery shopping in order to lift groceries, and is in many respects noncompliant in caring for her medical needs.[10]  In addition, the ALJ incorrectly noted that PA Rustemeyer assessed that Plaintiff had no limitations with regard to kneeling, stooping, crouching, or crawling, "which presumably would also cause pain."[11] [Id.] However, PA Rustemeyer's assessment indicates that Plaintiff should *never* kneel, stoop, crouch or crawl.

---

[10]  Plaintiff is noncompliant with her migraine medication stating "the side effects of the medications are worse than the migraine." [Tr. 226.] Plaintiff also failed to follow through with both physical therapy and individual counseling. [Tr. 255, 264.]

[11]  The inconsistency of the ALJ to on the one hand reject PA Rustemeyer's evaluation while on the other hand relying on it to support his position is not lost on the Court.  "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 363 f.3d 676, 681 (10th Cir. 2004).

[Tr. 258.]   Thus, the ALJ's reliance on this incorrect statement of the record is misplaced.

[Tr. 36, 45.]   For these reasons, the ALJ's RFC assessment that Plaintiff can perform light work

is unsupported by the substantial evidence.   This is error.

### 2.   Evaluation of Non-Medical Source Opinion

The ALJ's RFC assessment failed to explain why the non-medical source opinion of PA

Rustemeyer was not adopted.   The ALJ also failed to explain the weight given to PA

Rustemeyer's opinion or to ensure that the discussion of the evidence in the determination or

decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when

such opinions may have an effect on the outcome of the case.

SSR 06-3p explains that if a treating source opinion is not given controlling weight,

opinions of *other* medical sources, such as physician assistants, will be evaluated using the same

regulatory factors used for evaluating medical opinions.   SSR06-03 (citing 20 C.F.R.

§§ 404.1527, 416.927).   The evaluation of an opinion from a "non-medical source" who has seen

the individual in his or her professional capacity depends on the particular facts in each case.

Each case must be adjudicated on its own merits based on a consideration of the probative value

of the opinions and a weighing of all the evidence in that particular case.   SSR 06-03p at *3.

> In evaluating the evidence from other medical sources, SSR 06-03p states:
> An opinion from a "non-medical source" who has seen the claimant in his or her
> professional capacity may, under certain circumstances, properly be determined to
> outweigh the opinion from a medical source, including a treating source.   For
> example, this could occur if the "non-medical source" has seen the individual more
> often and has greater knowledge of the individual's functioning over time and if the
> "non-medical source's" opinion has better supporting evidence and is more
> consistent with the evidence as a whole.

SSR 06-03p at *6.

Finally, SSR 06-03p states how an ALJ should explain the consideration given to opinions from other medical sources as follows:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what an adjudicator must explain in the disability determination, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.*

SSR 06-03p at *6. (Emphasis added.)

Here, the ALJ is required to evaluate the opinion of PA Rustemeyer using the same regulatory factors used for evaluating medical opinions. In addition, the ALJ should explain the weight given to the opinion from this "other source," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. SSR 06-03p; 20 C.F.R. §§ 404.1527 and 416.927. Despite the fact that PA Rustemeyer had seen Plaintiff consistently for over two years, more than any other her medical provider, the ALJ failed to explain what weight he gave his opinion. This is error.

### 3.    Findings Regarding Plaintiff's Physical Severe Impairments

In determining Plaintiff's RFC, the ALJ failed to make specific findings supported by substantial evidence regarding Plaintiff's physical severe impairments and her ability to perform sustained work activities. For example, the ALJ discussed at length the potential limitations generally caused by obesity, and in conclusory fashion states he "considered the effects of the claimant's obesity" in his determination of the Plaintiff's residual functional capacity. However,

the ALJ failed to specifically articulate how Plaintiff's obesity factored into his determination of Plaintiff's residual functional capacity.

In considering Plaintiff's diabetes mellitus and migraines, the ALJ relied on State agency medical consultant Dr. David Green's review of Plaintiff's medical records and his conclusion that Plaintiff had "no evidence of end-organ damage caused by diabetes mellitus, and . . . only one emergency room visit and one outpatient visit for migraines."   The ALJ went on to recite Dr. Green's opinion that the claimant's "physical condition is non-severe."  The problem with the ALJ's summary conclusion regarding the severity of Plaintiff's diabetes mellitus and migraines, aside from the fact that it ignores certain evidence, is that it does not address the functional limitations and restrictions that result from these medically determined impairments. With respect to Plaintiff's migraines, the records indicate that Plaintiff presented to Family Practitioner Dr. Sanchez at least five times in 2008 and 2009 complaining of migraines. [Tr. 248, 250, 278, 279, 285.] She also presented to Presbyterian Hospital in October 2008 complaining of a migraine. [Tr. 214] Plaintiff described in her disability application that "[w]hen I get migraines, I need to be in the dark and I can't concentrate on anything." [Tr. 153.] Plaintiff reported to Dr. Simutis that she has migraines approximately three times a week and they can last for days. [Tr. 226.] Plaintiff reported to PT Neal her history of migraines. [Tr. 253.] Plaintiff informed LMHC Weeks that she suffers from migraines. [Tr. 262.] Plaintiff complained of chronic migraines during her  psychological evaluation with Dr. Moore. [Tr. 290.] Plaintiff testified at the hearing that she gets one or two migraines every week and they can last anywhere from two hours to all day.  [Tr. 49.] Plaintiff described having visual aura associated with her migraines, *i.e.*, seeing "little specks," that hinders her ability to concentrate.  [Tr. 50.] Finally, Plaintiff is prescribed Roxicet and Sumatriptan Succinate for treatment of migraine attacks.

[Tr. 200.]  The ALJ did not address all of the evidence regarding Plaintiff's migraines nor did he discuss the impact of Plaintiff's migraines on her ability to perform sustained work activities.

In considering Plaintiff's neuropathy, the ALJ relied solely on Plaintiff's physical therapy records that indicated Plaintiff was doing well and felt "pretty good" after doing light exercise. [Tr. 24.] In so doing, he failed discuss PA Rustemeyer's diagnosis of diabetic neuropathy and PT Neal's diagnosis of "pain in joint, pelvic region and thigh; abnormality in gait; muscular wasting and disuse atrophy." [Tr. 252.] He ignored that Plaintiff reported that her legs continued to be tight and painful after physical therapy. [Tr. 252.] He also ignored Plaintiff's testimony that her legs and feet routinely swell, that she has "tingling like needles on the bottom of [her] feet," and that she has difficulty with standing and walking as a result of the neuropathy. [Tr. 46-47.]

Finally, the ALJ did not address Plaintiff's hypertension.

For the foregoing reasons, the ALJ failed to make specific findings supported by substantial evidence regarding Plaintiff's physical severe impairments and her ability to perform sustained work activities.  This is error.

The Court will not address Plaintiff's remaining claims of error.  *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Decision [Doc. 17] is **GRANTED** for proceedings consistent with this memorandum opinion.

_____
**ALAN C. TORGERSON**
**United States Magistrate Judge,**
**Presiding by Consent**